**SANER–WHITEMAN LUMBER CO. v. TEXAS & N. O. R. CO.** (No. 8525.) *

(Court of Civil Appeals of Texas. Galveston. Jan. 8, 1925. Rehearing Denied Feb. 25, 1926.)

1. **Bailment** ⬄16 — **Railway using rails with knowledge and recognition of ownership of another acquired no title, and lessee's permitting such use was not in itself conversion (Vernon's Sayles' Ann. Civ. St. 1914, art. 6625).**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 6625, railway company using steel rails with full knowledge and recognition of ownership of another railway company acquired no title thereto, and fact that lessee of rails permitted such use was not in itself a conversion.

2. **Bailment** ⬄16—**Conversion of leased rails permitted by lessee to be included in railroad occurred at time of refusal of lessee and railroad to return them.**

Conversion of steel rails leased for use in tram road, and later included in incorporated railroad, occurred at time lessee and railroad company holding possession of rails refused to return them to owner.

3. **Bailment** ⬄16—**Lessee of steel rails, permitting use by railroad, preventing recovery by lessee or owner, held to have converted rails.**

Lessee of steel rails, voluntarily and without consent or knowledge of owner placing them where it was beyond power of lessee or owner to recover them by permitting use by incorporated railroad, *held* to have converted them.

4. **Appeal and error.** ⬄719(8)—**Finding not complained of in any assignment is binding on Court of Appeals, regardless of evidence.**

Finding of fact not complained of in any assignment presented by appellant is binding on

⬄For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted April 14, 1926.

Court of Appeals, regardless of evidence on issue.

**5. Estoppel ⬌119—Lessor's knowledge that leased rails had become part of incorporated railroad would not as matter of law estop it from claiming that lessee, by permitting such use and refusing to recover and deliver according to contract, was chargeable with conversion.**

Knowledge of lessor of steel rails that lessee had permitted tram road where rails were used to become part of incorporated railroad, and lessor's assistance in obtaining recognition of such railroad as common carrier, would not as a matter of law estop it from claiming that lessee, by permitting rails to remain and refusing to recover and deliver them to lessor according to contract, was chargeable with conversion and liable for value.

**6. Limitation of actions ⬌127(8)—Recovery of steel rails held not barred by limitation because of different cause of action in amended petition, where amended and original petitions were both predicated on refusal and failure of lessee to deliver rails according to contract.**

In suit to recover for conversion of steel rails, where amended and original petitions both were predicated on refusal and failure of lessee to deliver rails according to contract, *held*, that amended petition changing time as of which conversion was alleged did not set up different cause of action so as to have been barred by statute of limitation.

**7. Bailment ⬌30—Allegation that lessee had failed to deliver rails to lessor according to contract, and alleging damages, held to charge conversion so as to admit proof of value.**

Allegation of lessee's refusal to deliver rails to lessor according to contract after notice of intention to terminate contract, and that lessor had been damaged in sum of $65,000, *held* to sufficiently charge conversion and claim for damages to admit proof of value of rails at time of conversion.

**8. Contracts ⬌137(4)—Provision of contract for lease of steel rails requiring lessee to ship output over lessor's railroad, if void, would not defeat lessor's right to recover rails delivered to lessee under other lawful provisions of contract (Anti-Trust Statute [Rev. St. 1925, art 7426 et seq.]).**

Provision in contract leasing steel rails for tram road for shipment of all of lessee's output over lessor's railroad, if void, under Anti-Trust Statute (Rev. St. 1925, art. 7426 et seq.), did not defeat owner's right to recover rails delivered to lessee under other lawful provisions of contract, they not being so interdependent that illegality of one provision was destructive of entire contract.

**9. Bailment ⬌16—Lessee, failing to deliver steel rails on demand on termination of lease, held to have converted rails.**

Lessee of steel rails, failing to deliver rails to owner on demand, after termination of its lease, not being prevented from doing so by operation of law or vis major, *held* to have converted rails, and liable therefor.

On Motion for Rehearing.

**10. Action ⬌32.**

When facts pleaded and proven by plaintiff show him entitled to relief prayed for, such relief should be granted, regardless of form of action.

**11. Bailment ⬌16—Lessee of steel rails, under contract requiring delivery to lessor on termination of lease, having permitted use of rails by railroad, is liable for conversion, though not making adverse claim.**

Lessee of steel rails, under contract requiring him to deliver rails to lessor at termination of lease, having permitted use of rails in system of incorporated railroad, is liable for conversion on failure to deliver to lessor on demand, notwithstanding lessee is not making any adverse claim, and lessor could recover rails from present user.

**12. Railroads ⬌138—Lessee of steel rails not relieved of primary obligation under contract to return rails to lessor, where lessee had permitted use of rails by incorporated railroad, with acquiescence of owner.**

Where lessee of steel rails had permitted use in system of incorporated railroad, *held* that although lessor had right of recovery from such railroad, lessee was not relieved of primary obligation of contract to return rails to lessor on termination of lease, notwithstanding lessor's acquiescence in continued use of rails by such railroad company.

**13. Bailment ⬌16—Lessee's refusal to bring suit against railroad permitted to use leased rails is inconsistent with rights of lessor and with lessee's contract to return rails on termination of lease, and constitutes conversion.**

Where lessee of steel rails had permitted their use in incorporated railroad system, *held*, that lessee's refusal to maintain suit for possession of leased rails, while not an assertion of claim of ownership, was inconsistent with rights of lessor and of lessee's contract obligation to return rails on termination of lease, so as to constitute a conversion.

**14. Contracts ⬌309(1)—Impossibility of performance of agreement to return steel rails according to contract occurring subsequently to execution of contract does not discharge lessee from its obligation.**

Impossibility of performance of lessee's agreement to return steel rails to owner on termination of lease occurring subsequent to execution of contract does not discharge lessee from its obligation.

**15. Appeal and error ⬌880(3)—Lessee of steel rails who permitted use of rails by railroad cannot complain on appeal from judgment against it of error in refusing to give owner judgment against codefendant railroad company, having filed no pleading asking such relief.**

In suit to recover steel rails leased to lumber company and permitted by it to be included in incorporated railroad line, lessee, having

filed no pleading asking relief against railroad having possession, cannot on appeal complain of judgment against it because of trial court's error in refusing to give plaintiff judgment against co-defendant railroad company.

**16. Appeal and error ⊚⊃518(4)—Trial court could consider original petition in considering demurrer to amended petition, and it was unnecessary to put original petition in evidence and bring it up in statement of facts.**

In considering demurrer raising issue of limitation on ground that amended petition set up new cause of action, trial court could consider original petition on file, and it was unnecessary for appellants to put that petition in evidence and have it brought up under statement of facts to properly present it to Court of Appeals.

**17. Limitation of actions ⊚⊃127(1)—Test, in determining if new cause of action is pleaded in an amended petition to which defense of limitations is available, is whether facts relied on are in both old and new pleadings.**

Test, in determining whether new cause of action is pleaded in an amended petition to which defense of limitations is available, is whether facts relied on to sustain recovery are alleged in both the old and new pleadings.

**18. Bailment ⊚⊃32—Lessee of steel rails permitting their inclusion in line of railroad held not liable for highest market price between date of refusal to deliver and trial.**

Lessee of steel rails permitting railroad to include them in its line *held* not guilty of such fraud, willful wrong, or gross negligence as would make it liable for highest market price between date of refusal to deliver to owner and trial, and only liable for value at time of refusal.

**19. Trial ⊚⊃399—Finding of trial court, in suit to recover steel rails from lessee, of value at time rails were delivered, held an inadvertent clerical error, to be construed as finding of value at time they should have been delivered.**

Where, in suit by owner to recover steel rails from lessee, pleadings or evidence did not mention value of rails at time of delivery to lessee, finding of trial court as to value at time steel rails were delivered must be regarded as inadvertent clerical error, and construed as finding of value of rails at time they should have been delivered to owner by lessee.

**20. Bailment ⊚⊃31(3)—Evidence held to support inference steel rails were worth amount found by court.**

In suit by owner to recover steel rails from lessee, evidence *held* to support reasonable inference that rails were worth amount found by trial court.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Suit by the Texas & New Orleans Railroad Company against the Saner-Whiteman Lumber Company and the Caro Northern Railway Company. Judgment for plaintiff and for defendant last named, and defendant first named appeals. Affirmed.

Gill, Jones, Tyler & Potter, of Houston, and Saner, Saner, Turner & Rodgers, of Dallas, for appellant.

Baker, Botts, Parker & Garwood and Garrison & Watson, all of Houston, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against the appellant and the Caro Northern Railway Company to recover damages for the alleged conversion by defendants of steel railroad rails alleged to have been worth, at the time of their conversion, the sum of $65,000. Plaintiff's petition alleges in substance: That the rails converted by defendants were leased by it to the appellant lumber company to be used in laying a track for a tram railroad operated by the lumber company in Nacogdoches county; that by the terms of said lease contract, which was executed on June 1, 1905, it might continue in force for a period of 15 years from its date, and upon its termination, either by reason of the expiration of the period of existence named therein, or by reason of any other cause in said contract provided, said lumber company became in duty bound to take up said rails and deliver same to the plaintiff at the station of Caro, in Nacogdoches county, in the same condition, wear, and tear excepted, as they were in when they were delivered to said lumber company in default of which, for 60 days, plaintiff should have the right to take up said rails, transport them to Caro, and charge the expense thereof to said lumber company. That the lumber company, in violation of the terms of said contract, proceeded to permit the rails leased from the railroad company to go into the track of the Caro Northern Railway Company, a railroad corporation which had been recognized by the Railroad Commission of Texas on March 25, 1907, and that the lumber company thereupon voluntarily placed itself in a position where it could not comply with the terms of said contract, and thereupon became guilty as of conversion of said rails as of the time of the recognition by the Railroad Commission, and that the reasonable value of said rails at that time was $65,000. That the lumber company, under the terms of said lease, was liable for the rental of said rails at the rate of $100 per mile per annum from June 1, 1917, to which date the said rent was paid, to the Railroad Company's total damage in the sum of $7,500.

The railroad company further alleges: That under said contract the lumber company on June 30, 1916, notified the railroad company that on and after six months from that date there would exist no further necessity for the lease of said rails, but that it failed to take up and deliver the same to the railroad company, to plaintiff's damage in the sum of the value of said rails at the time of the acts

complained of in the incorporation of the defendant Caro Northern Railway Company, in the sum of not less than $65,000. That the lumber company had an option in said contract to purchase said rails, but that, instead of exercising said option, the rails were placed in the line of the Caro Northern Railway Company and converted at the time of the incorporation of said company, to the damage of the railroad company in the sum of $65,000. That the defendant Caro Northern Railway Company, since the incorporation thereof, with the active co-operation, acquiescence, and consent of the lumber company, has used said rails as a part of its main track, to the damage of the plaintiff railroad company as for conversion in the sum of $65,000.

The railroad company further alleges the failure of the lumber company to comply with the terms of said contract, and alleges its damage as being the value of said rails as of date of the termination of said contract in the sum of $65,000, and in addition thereto the rental upon said rails in the sum of $7,500; that the reasonable cost of taking up the rails is $5,000; the reasonable value of said rails at the time of the conversion thereof and at the time of the forfeiture of said contract by the lumber company is $65,000; and the amount of rental due by the lumber company under said contract, $7,500.

The railroad company prays (a) that it be decreed to be the owner of the title and of the right to the possession of said rails; (b) that it recover the rental under the contract in the sum of $7,500; and (c) that it recover the sum of $65,000 "as the value of said rails at the time of the termination and breach of said contract;" in the alternative, and in the event it be held that said rails can now be taken up and delivered to the railroad company, that it have judgment for the title and possession of said rails, and for the sum of $5,000, the reasonable cost of taking up said rails, and the sum of $7,500 as rental under said contract.

No answer was filed for the Caro Northern Railway Company.

The defendant lumber company answered by general demurrer, numerous special exceptions, general denial, and by plea of estoppel and several pleas of limitation.

The trial in the court below without a jury resulted in a judgment in favor of appellee against the appellant for the sum of $39,981.-99, and in favor of the Caro Northern Railway Company that plaintiff take nothing against it.

At the request of appellant, the trial judge filed the following findings of fact:

"(1) I find that on June 1, 1905, plaintiff, T. & N. O. R. R. Co., entered into a contract with the Whiteman-Decker Lumber Company by the terms of which plaintiff leased to the Whiteman-Decker Lumber Company 15 miles of certain steel rails for a rental of $100 per mile per annum. Said contract also provided that said rail shall be relay steel of about 50 pounds per yard, to be delivered to said lumber company at its station of Caro in Nacogdoches county, 15 miles of said steel to be delivered by June 15, 1905; that said rail shall be and remain the property of said railroad company, and be kept separate from other rails used by said lumber company so that they may be easily and conveniently identified, and that no other rail would be mixed or intermingled with the rails leased by said railroad company; that said lumber company would execute any other instrument of writing that might be deemed necessary in order to protect said railroad company in the ownership of said rails, and to prevent any other person acquiring a lien or claim upon same; that said lumber company agreed that it would acquire the title for all lands on which said rails were laid, to the end that said railroad company might protect itself against having its rails laid upon lands which were not owned by the lumber company; that said rental was to be paid to the railroad company at its general offices in Houston, Tex.; that, upon failure of the lumber company to pay any annual rental, the railroad company should have the right to enter upon said tram road and remove its rails therefrom upon giving the lumber company 30 days' notice of its intention to do so; that said contract was to continue for a period of 15 years beginning June 1, 1905, unless sooner terminated, and should said lumber company's supply of timber be exhausted before the expiration of said period it should have the right to terminate said contract after the expiration of 5 years by giving 30 days' notice of its intention to do so, and thereupon it became the duty of said lumber company to take up said rails and deliver same to the railroad company at said station of Caro, in the same condition, ordinary wear and tear excepted, that they were in when delivered to said lumber company; that, if said lumber company should fail or refuse, after a period of 30 days after demand to them by said railroad company, then the said railroad company should have the right to take up said rails and transport them to said station of Caro, and charge the reasonable expense thereof to said lumber company.

"Said contract further provided that said lumber company should have the privilege of purchasing said rail at any time that they might desire, at such price as might be agreed upon; said lumber company agreeing to pay cash in the event of such a purchase, and such purchase to cause the rental to cease on such rails as might be in such sale.

"(2) I find as a fact that on the 15th day of March, A. D. 1913, a contract was entered into by and between the Texas & New Orleans Railroad Company and the Saner-Whiteman Lumber Company, wherein the Saner-Whiteman Lumber Company referred to the contract dated June 1, 1905, recited the purchase by the Saner-Whiteman Lumber Company of the properties of the Whiteman-Decker Lumber Company, and recognized said contract to be binding upon it as successor of the Whiteman-Decker Company; and it provides for the lease of two additional track miles of 50-pound relay steel rails on the same terms and conditions as contained in the contract of June 1, 1905.

"(3) I find as a fact that at the time said contract was entered into it was contemplated by the parties that the rails would be used in the construction of a tram or logging railroad for the use of the Lumber Co., and that said rail was to be kept together so that it could be identified.

"(4) I find as a fact that 8 or 9 miles of steel was laid by the lumber company and used by it for logging its mill, when the officials of the lumber company were approached by the citizens of Mt. Enterprise with a view to incorporating said tram road and extending it into said town of Mt. Enterprise and converting it into a common carrier, which was done about September 1, 1906; and that the balance of said rail was delivered subsequent to the incorporation of said road, and was used for the completion of said road into Mt. Enterprise.

"(5) I find as a fact that prior to the incorporation of said road the officials of the lumber company had a conference with Mr. W. R. Van Vleck, who was then vice president and general manager of the Southern Pacific lines, concerning the feasibility of the road, the prospect for business, and the advantages to the lumber company and to the T. & N. O. R. R. Co. in incorporating said road; that thereafter, and prior to said incorporation, Mr. Van Vleck sent a committee consisting of A. S. Johnson, general superintendent of the T. & N. O. R. R. Co., T. G. Beard, general freight agent, and Charles Tanheauser, chief engineer, who made an inspection of said proposed roadbed into Mt. Enterprise.

"(6) I find as a fact that plaintiff railroad company at no time contracted or agreed with the lumber company that it should turn over and deliver to the Caro Northern Railway Company steel rails to be used by it in the construction of its road as a common carrier, or that said lumber company obtained or sought permission from said railroad company, or its duly authorized officers, to permit it to place said steel in the track of the railway company, or that said contracts were ever modified between the parties, or that the railroad company, or its duly authorized agents, were informed by the lumber company that they intended to turn over and deliver the steel leased by the lumber company to the Caro Northern Railway Company.

"(7) I find as a fact that the officers of the Caro Northern Railway Company and the officers of the lumber company were identical, with the exception of two directors, who held one share of stock of the railway company.

"(8) I find as a fact that in June, 1916, the Saner-Whiteman Lumber Company notified the T. & N. O. R. R. Co. that the contract for the rental of said rails would be terminated on January 1, 1917, and that the rentals for said rails were paid to the said railroad company until July, 1917.

"(9) I find as a fact that the plaintiff railroad company had no notice that the rentals on said rails were being paid between the periods of January 1, 1917, and July, 1917, by the Caro Northern Railway Company, and not by the Saner-Whiteman Lumber Company; the testimony showing that payments were made by checks against Saner-Whiteman, bankers.

"(10) I find as a fact that the mill of the Saner-Whiteman Lumber Company ceased to operate in the month of December, 1916, at the time the Saner-Whiteman Lumber Company gave notice to the T. & N. O. R. R. Co. that said contract would be terminated.

"(11) I find as a fact that the 2 miles of rail referred to in contract entered into between plaintiff railroad company and defendant Saner-Whiteman Lumber Company were returned to said railroad company at some time prior to the filing of this suit.

"(12) I find that the 15 miles of rail referred to in the contract entered into on June 1, 1905, are at this time in the roadbed of the Caro Northern Railway Company, which was incorporated under the laws of the state of Texas about September 1, 1906, and is a common carrier.

"(13) I find as a fact that about September or October, 1917, the plaintiff, T. & N. O. R. R. Co., demanded of the Saner-Whiteman Lumber Company the return of said rail, and that the said Saner-Whiteman Lumber Company refused to return said rail to the plaintiff, T. & N. O. R. R. Co.

"(14) I find as a fact that the reason the Saner-Whiteman Lumber Company refused to return the rail to the plaintiff, T. & N. O. R. R. Co., when requested by the plaintiff, was on account of said rail being placed in the roadbed of the Caro Northern Railway Company, a common carrier, and that they were unable so to do.

"(15) I find that the Saner-Whiteman Company, the successor to the Saner-Decker Lumber Company, placed or caused to be placed the steel leased by the plaintiff in the roadbed of the Caro Northern Railway Company.

"(16) I find as a fact that the placing of the rail in the roadbed of the Caro Northern Railway Company, a common carrier, by the Saner-Decker Lumber Company, or its successor, Saner-Whiteman Lumber Company, was voluntary upon their part for the benefit of said Saner-Decker Lumber Company, or its successor, Saner-Whiteman Lumber Company, and that the refusal to return or deliver said rail to the plaintiff, when requested or demanded by the railroad company, was a conversion of said rail upon the part of said Saner-Whiteman Lumber Company.

"(17) I find as a fact that the highest market value of 1,131.74 tons of good secondhand steel, after the date of its conversion, was $55 per ton; and I find as a fact that the highest market value of 47.098 tons of scrap steel after its conversion was $29 per ton.

"(18) I find as a fact that the value of the 1,131.74 tons of steel at the time of the trial was $30 per ton; and I find as a fact that the value of the scrap steel at the time of the trial was $11 per ton.

"(19) I find as a fact that the highest value of the steel that plaintiff is entitled to recover was as follows:

1,131.74 tons valued at........................ $39,510 90
47.098 tons valued at.......................... 470 98

Making a total value of the steel at the time it was delivered...................... $39,981 88

"(20) I find as a fact that the plaintiff was unable to take up the steel after refusal to the defendant to deliver the same to the plaintiff for the reason that said steel was then being used in the roadbed of the Caro Northern Railway Company and said railway company was then in

the hands of a receiver and being operated by a receiver for the purpose of preventing the taking up of said steel."

None of these findings of fact is complained of by any assignment of error presented by appellant.

The first and second propositions presented by appellant are as follows:

"I. There was no conversion of the rails leased by the railroad company to the lumber company because the railroad company consented to and acquiesced in the placing of the rails in the line of the Caro Northern Railway Company.

"II. The railroad company having had full knowledge and having acquiesced and consented to the incorporation of the Caro Northern Railway Company, and having through its attorneys and through its general freight agent actually joined in the application for the recognition of the railroad company as a common carrier by the Railroad Commission of Texas, and having at all times had full knowledge of the use to which the rails were put, and having issued joint tariffs and maintained joint depots and employed joint agents, and having stood silently by without having raised any objection of any kind or character, it is equitably estopped from setting up that the rails in question were converted by the act of the lumber company in permitting them to be placed in the line of the Caro Northern Railway Company."

Neither of these propositions presents any sound reason for reversing the judgment of the trial court.

We agree with appellant that the fact that it permitted the rails, or at least a portion of them, to remain in the track of the tram railroad after such railroad had been incorporated as a railway, and had been recognized by the State Railroad Commission as a common carrier, was not in itself a conversion of the rails by appellant.

[1] The evidence discloses that the railway company kept and used the rails with a full knowledge and recognition of appellee's ownership thereof, and paid to appellant the rental therefor, which appellant continued to pay to appellee up to July 1, 1917. It is clear from these facts that the Caro Northern Railway Company acquired no title to or right of possession of the rails against appellee inconsistent with appellant's contract with appellee, and we agree with appellant's contention under its eleventh proposition that "there is nothing in the Constitution or statutes or laws of this state to prevent the railway company (appellee) from removing its rails now in the tracks of the Caro Northern Railway Company," nor it there anything in the Constitution or laws of this state to prevent appellant from removing the rails. The learned trial court evidently construed article 6625, Vernon's Sayles' Ann. Civ. St. 1914, as a restriction of appellee's right to take possession of or recover its property. This court refused to so construe that article in the case of Rail-

way Co. v. Kinkead, 60 S. W. 468, in which we held:

"It [the article cited] cannot, by any reasonable intendment, be held to restrict the right of a citizen to recover his property from a railroad company that has wrongfully taken possession of same,"

We are not inclined to doubt the soundness of that holding, and it applies with equal force to the railroad company that wrongfully withholds from the citizen his property.

[2] Under this view of the law, the conversion of plaintiff's rails occurred when appellant and the Caro Northern Railway Company, which held possession of the rails under it, refused to return them to appellee.

[3, 4] If we are wrong in our conclusion that the rails could have been removed from the track of the Caro Northern Railway, the appellant nevertheless should be held to have converted them by voluntarily, and without the consent or knowledge of appellee, placing them where it was beyond the power of appellee or appellant to recover them. In the sixth conclusion of fact before set out, the trial court finds that appellee never agreed that its rails should be turned over to the Caro Northern Railway Company to be used by it in the construction of its road as a common carrier, nor did the appellant obtain or seek to obtain permission from appellee to place the rails in the track of said railway, or even inform appellee of its intention to deliver the rails to the Caro Northern Railway Company. As before stated, this finding of fact is not complained of in any assignment presented by appellant, and is therefore binding upon this court, regardless of what the evidence may be on the issue.

[5] The fact that the appellee may have known that its rails were in that portion of appellant's tram road which became a part of the Caro Northern Railway after that corporation was organized, and, with such knowledge, assisted appellant in obtaining recognition of said railroad as a common carrier by the State Railroad Commission, would not as a matter of law estop it from claiming that appellant, by permitting the rails to remain in said railroad and refusing to recover and deliver them to appellee, as it had contracted to do, was chargeable with conversion of the property and liable to appellee for its value. It may well be doubted whether the evidence raises any issue of estoppel, but, under our view of the law above expressed, that the rails could be taken from the tracks of the Caro Northern Railway Company, the question of estoppel raised by appellant becomes immaterial.

Propositions 3 to 6, inclusive, presented by appellant, raise issues of limitation which are predicated upon the contention that, if there was a conversion of the rails by appellant at the time they were placed in the track of the Caro Northern Railway Company, plaintiff's suit for damages for such conversion having

been brought more than four years thereaft-er, the cause of action was barred, and the further contention that the amended petition upon which the cause was tried, which was filed September 1, 1921, and alleges the conversion of the rails at the time appellant refused to deliver them to appellee, set up a new and different cause of action from that alleged in the original petition, and the conversion therein alleged was barred by the two and four years' statutes of limitation.

[6] There is no merit in any of these propositions. The original petition, which was brought up as a part of the transcript, was not introduced in evidence in the court below and is not properly before us. If, however, we should consider that petition, we cannot agree with appellant that it alleges a different cause of action from that set up in the amended petition. Both petitions seek to recover of appellant the rails leased it under the contract which forms the basis of this suit, and the cause of action set up in both is predicated upon the refusal and failure of appellant to deliver the rails as it had contracted to do. The substance of the cause of action is the same in both petitions.

Appellant's next complaint is that there is neither pleading nor evidence to support the trial court's finding of the value of the rails at the time of their conversion.

Plaintiff's petition contains the following allegations:

"That the defendant company violated the terms and provisions of said contract in failing to keep said rail separate from other rail used by it, and in permitting said rail to become a part of the main line of the defendant railway company, and in failing to pay the annual rental charges due from and after the 1st day of June, 1917; in failing at the termination of said contract by reason of the exhaustion of its supply of timber, after notice given by it of its intention to terminate said contract within six months from the date of said notice, to take up and deliver said rail to the plaintiff; that the intent and purpose of said contract was that, the date fixed therein for its termination, or for other cause provided for therein, said rails should be taken up and delivered back to the plaintiff, or should be left in such condition as to identification, possession, and claims as that it might take same up and charge the cost thereof to said defendant, the annual rental thereon to be paid up to and including the time of the redelivery of said rails to this plaintiff; that defendant, by its acts and conduct and the breaches hereinbefore set out, has violated the express terms and purposes of said contract, and by reason thereof plaintiff has been damaged to the value of said rails in the sum of $65,000, being the reasonable value of said rails at the time of the conversion thereof and at the time of the forfeiture of said contract by said defendant lumber company."

[7] We think this allegation sufficiently charges a conversion of the rails when appellant failed and refused, after demand by appellee, to pay further rental therefor, or to take them up and deliver them to appellee. The claim for damages for such conversion in the sum of $65,000 is a sufficient allegation to admit proof of the value of the rails at the time of the conversion.

There is ample evidence to sustain the finding of the trial court of the value of the rails so converted.

Appellant further contends that the contract under which appellee seeks to recover is wholly void because violative of the anti-trust statutes of this state (Rev. St. 1925, art. 7426 et seq.). We cannot concur in this contention, which is predicated upon the following provision of the contract by which appellee leased the rails to appellant:

"And further agrees to ship out over said railroad company's line all of the output of said sawmill plant except so much as may be sold to local customers at Caro, and further agrees that said shipments over said railroad company's line shall be not less than one million feet per month."

[8] If the suit was brought for a violation of this provision of the contract there might be some force in appellant's contention, though we are not inclined to hold under the facts of this case the quoted provision violated the provisions of our anti-trust statute. The undisputed facts show that appellee was and is the only line of railway over which the output of appellant's mill could be shipped except such as might have been shipped to Mt. Enterprise after the extension of the Caro Northern Railroad to that place, and, as lumber for that place could not be shipped over appellee's railway, the contract should not be construed as preventing the shipment over the Caro Northern. If, however, this provision of the contract should be held void, its illegality could not defeat appellee's right to recover its rails delivered to appellant under other lawful provisions of the contract. The several provisions of the contract are not so interdependent that the illegality of one provision should be held destructive of the entire contract and all rights secured thereby.

[9] Appellant having failed to deliver the rails to appellee upon demand after the termination of its lease, and not being prevented from so doing by operation of law or vis major, its failure so to deliver them was in law a conversion, and rendered it liable for their value. Young v. Lewis, 9 Tex. 73; Nelson v. King, 25 Tex. 655; Warehouse Co. v. Rice Co. (Tex. Civ. App.) 164 S. W. 396.

We are of opinion that the judgment should be affirmed, and it has been so ordered.

Affirmed.

### On Motion for Rehearing.

After mature and careful consideration of appellant's motion for rehearing, we have reached the conclusion that it should be overruled. Before discussing the points presented by the motion, we will amplify the con-

clusions expressed in our original opinion as to the specific nature of the suit and the general principles of law upon which our judgment of affirmance is based.

The suit is one for the recovery of possession of specific property, or its value, and is in most respects similar to the common-law action of trover, but the right of appellee to recover the property or its value is based upon a contract, and the principles and rules of law applicable in suits to recover damages for breach of contract must also be given effect in determining the questions presented by the record.

[10] At common law the technical form of the action was always controlling in determining the plaintiff's right of recovery, but under our liberal system of pleading the common-law forms of action are disregarded, and when the facts pleaded and proven by a plaintiff show him entitled to any relief prayed for by him, such relief should be granted.

While our original opinion is not as clear as it might have been in some of its statements of the conclusions upon which our judgment of affirmance was based, we think it apparent from the whole opinion that our affirmance of the judgment was based upon the conclusion that by the express terms of the contract between the parties which was pleaded, in every petition filed by appellee, as the foundation of its cause of action, appellants were obligated, when they ceased to pay rental for the rails and notified appellee that they had terminated the lease, to return the rails to appellee, and that none of the facts pleaded and proven by appellants relieved them of this obligation, and their failure to comply with their contract rendered them liable to appellee for the value of the rails.

[11] The first contention made by appellants in their argument on the motion for rehearing is, in substance, that they cannot be held liable for damages for conversion because they are not making and have never made any adverse claim to the rails, and have not placed them beyond the reach of the appellee, and, as appellee could have recovered them from the Caro & Northern Railway Company, it cannot hold appellants liable for their value. We think this contention is answered by the terms of the contract under which appellants obtained and held possession of the rails.

It is provided in section 2 of the contract that—

"No other rails shall be mixed or intermingled with the rails so leased by said railroad company to said lumber company, so that the rails provided for by this contract shall always be susceptible of ready and complete identification by their position in said tramroad. It is further agreed that said lumber company will execute any other or further instruments of writing that may be deemed necessary by said railroad company in order to protect it fully in the ownership of said rails and to prevent any other person from acquiring any lien or claim upon same."

In the next section of the contract it is provided that appellants will not place the rails upon any land not owned by them.

In section 6 it is stipulated that, upon the termination of the contract of lease—

"it shall be the duty of said lumber company to take up said rails and deliver the same to the railroad company at said station of Caro in the same condition, ordinary wear and tear excepted, that they were in when delivered to said lumber company, and if said lumber company fails or refuses for the period of sixty days so to do after demand to that effect by the said railroad company, then the said railroad company shall have the right to take up said rails and transport them to said station at Caro, and charge the reasonable expense thereof to said lumber company."

It seems clear to us that under these provisions of the contract appellants were bound, at the expiration of the time for which they had paid appellee for the use of the rails, they having previously notified appellee of the termination of the lease, to take up and deliver the rails to appellee, and their failure to make such delivery was a breach of their contract which entitled appellee to sue them for possession of the rails, or their value, and in such suit make the Caro Northern Railway Company, who was in possession of the rails and asserting ownership thereof, a party defendant, and seek judgment for the rails or their value against both defendants. Though inartistically and in some respects inaccurately pleaded, this is the substance of the cause of action set up in appellee's original and amended petitions.

[12] When appellants failed to deliver the property in accordance with their contract they could not relieve themselves of this obligation by the claim that the Caro Northern Railway Company, in whose possession they had placed the rails, refused to surrender their possession, and require appellee to assume the burden of their recovery. The provisions of the contract before set out evidence the clear intention of the parties to protect appellee against just such a situation as the facts in this record disclose. While the right of appellee to recover the rails from the Caro Northern Railway is, we think, clear, this does not relieve appellants of their primary obligation under their contract to return the rails to appellee, nor affect their liability for the value of the rails. The acquiescence of appellee in the continued use of the rails by the Caro Northern Railway after it had been recognized by the Railroad Commission as a common carrier in no way changed appellant's contract obligations. Appellee had the right to rely upon appellants' agreement to return the rails at the expiration of the lease, or to purchase and pay for them, as they had a right under the con-

tract to do at any time, and it was appellants' duty, when the lease terminated, to recover these rails from the possession of the Caro Northern Railway and deliver them to appellee, and their failure so to do renders them liable for the value of the rails as in conversion. They cannot relieve themselves of this liability by the plea that appellee can recover the rails from the Caro Northern Railway. As stated in our original opinion, we cannot agree with appellants that they cannot maintain a suit against the Caro Northern Railway to recover possession of the rails. Having a right to maintain a suit to recover the rails, they cannot under their contract shift the burden of such suit upon appellee and thus relieve themselves of their contract obligations. It is true that appellee assumed this burden in this suit, but in so doing it was careful by its pleading not to absolve appellants from their primary obligation under their contract. The trial court, as we think, erroneously held that appellee could not recover the rails from the defendant railway, and only gave it judgment on its claim against appellants. Both defendants being liable for the value of the rails, appellee was not required to appeal from the judgment in favor of the defendant railway. Appellants were primarily liable to appellee, and, if as between themselves and the defendant railway it should be held liable for the value of the rails, they should have so pleaded in the trial court and have prosecuted an appeal from the judgment in favor of said defendant.

The findings of the trial court Nos. 13 and 14, which are set out in our original opinion, are as follows:

"(13) I find as a fact that about September or October, 1917, the plaintiff, T. & N. O. R. R. Co., demanded of the Saner-Whiteman Lumber Company the return of said rail, and that the said Saner-Whiteman Lumber Company refused to return said rail to the plaintiff, T. & N. O. R. R. Co.

"(14) I find as a fact that the reason the Saner-Whiteman Lumber Company refused to return the rail to the plaintiff, T. & N. O. R. R. Co., when requested by the plaintiff, was on account of said rail being placed in the roadbed of the Caro Northern Railway Company, a common carrier, and that they were unable to do so."

As stated in our original opinion, these fact findings are not questioned by any assignment presented in appellants' brief, and we must assume are sustained by the evidence, and must disregard the contention in appellants' motion "that there is no evidence to show a demand and refusal to return the rails."

Appellants' contention that they are not liable for the value of the rails upon the facts found by the trial court must rest upon the theory that, because appellee can recover the rails from the defendant railway, they are relieved from the obligations of their contract. We think this theory is manifestly unsound. It cannot be a sufficient answer to appellee's request for the return of its rails for appellants to say, "We placed your rails in possession of the Caro Railway, and it is now claiming them, and refuses to let us have them to deliver to you, and you must bring suit against the Caro Railway and recover the rails and let us reimburse you for the costs of the suit." We know of no rule of law or equity which requires appellee to accept, in lieu of appellants' liability for the rails or their value, that of the defendant railway, and this is what appellants contend appellee must do under the facts disclosed by the record.

It is true that appellants assert no ownership of the rails, nor have they placed them beyond the reach of appellee to recover by suit against the defendant railway, but they placed them where appellee can only recover them by suit, and appellants' refusal to recover and deliver the rails is in disregard of their contract obligations and makes them liable for their value. They state in their brief and in their argument in their motion that the Caro Northern Railway has no right to the possession of these rails, and can be required to deliver them to the owner, but they claim that they cannot maintain a suit to recover the rails because they have no title thereto. This seems to us an unreasonable misapprehension of the law.

[13] The undisputed evidence shows that the Caro Northern Railway obtained and held possession of the rails with full knowledge of appellants' contract which required their return to appellee upon the termination of the lease, and that said railway paid the rentals on the rails to appellants for the use and benefit of appellee up to July, 1917, thus fully recognizing appellee's ownership and appellants' obligations under their contract. Such being the facts, it seems to us that the appellants' right to maintain a suit against the defendant railway for possession of the rails goes without saying, and their refusal, while not an assertion of any claim of ownership, is so inconsistent with the rights of appellee, and with appellants' contract obligations, as to constitute a conversion of the rails. This holding is not inconsistent with the holding in the case of Direct Navigation Co. v. Davidson, 74 S. W. 790, 32 Tex. Civ. App. 492, and the rule stated in 3 R. C. L. p. 120, which are cited by appellants in support of their contention that their refusal to deliver the rails does not make them liable for their value. In the case cited there was no demand and refusal to deliver the property which had been left by the bailee in possession and under the dominion and control of the owner, though not at the place called for by the contract, and the only question in the case was whether the charge of the court upon the measure of damages was so misleading as to require a reversal of the

judgment. The citation from R. C. L. supports our conclusion that appellants' reason for their refusal to deliver the rails does not avoid the general effect of such refusal, which renders them liable for the value of the rails.

[14] We have discussed the merits of this motion so far on the assumption of the soundness of our conclusion that neither the defendant railway nor its receiver could hold these rails against either the appellee or the appellants without paying for them, and as before said, we have no doubt of the soundness of this conclusion. But if the conclusion is not sound, and it' has become impossible for appellants to comply with their contract to deliver the rails, this impossibility, having arisen subsequent to the execution of the contract, would not relieve appellants of their obligation, there being no such provision in the contract.

Appellants' agreement to return the rails to appellee upon the termination of the lease, unless they took advantage of the right to purchase them as provided in the contract, was absolute, and impossibility of performance occurring subsequent to the execution of the contract does not discharge them from their obligation; especially is this true if by their act in placing the rails in the possession of the defendant railway it has become impossible for them to now return them to appellee. 13 C. J. p. 639, § 712 (3); Irrigation Co. v. Dodd (Tex. Civ. App.) 162 S. W. 946; Irrigation Co. v. Watkins (Tex. Civ. App.) 183 S. W. 431; Navigation Co. v. Davidson, 74 S. W. 790, 32 Tex. Civ. App. 492.

The rule is thus clearly stated in the case of Bailey v. De Crespigny, L. R. 4 Q. B., 180–185, 15 E. R. C. 799, cited in support of the text above cited from Corpus Juris:

"There can be no doubt that a man may by an absolute contract bind himself to perform things which subsequently become impossible, or to pay damage for the nonperformance, and this construction is to be put upon an unqualified undertaking where the event which causes the impossibility was or might have been anticipated or guarded against in the contract, or where the impossibility arises from the act or default of the promisor."

In their argument on their motion appellants strenuously object to our statement of appellee's pleadings. The objection is that the statement of the pleadings copied in our opinion from the brief of appellee is not, because of certain omissions, a correct statement of the substance and reasonable intendment of the pleading, and that appellee's pleadings as a whole cannot be construed as asserting a cause of action based on the refusal of appellants to deliver the rails upon the demand of appellee.

The last quotation from appellee's pleading set out in our original opinion was copied from appellee's brief, and does not, as appellants contend, show on its face that the allegations copied were segregated and not placed in the context in which they appear in the pleadings. This inaccuracy in the statement escaped our attention at the time it was copied in the opinion, but it did not' and does not affect our construction of the pleadings as a whole. The pleading is too lengthy to set out in this opinion, but, as before said, we think it does allege a cause of action against both appellants and the defendant railway based on their wrongful retention and refusal to deliver appellee's property after demand for such delivery.

[15] It is true, as urged by appellants, that the case seems to have been tried in the court below upon the theory that the rails could not be recovered from the defendant railway; but since appellants are liable upon the facts found by the trial court for the value of the rails in any event, and filed no pleading asking relief against the defendant railway, they cannot, because of the error of the trial court in refusing to give appellee judgment against their codefendant, now complain of appellee's judgment against themselves.

[16] We erred in our original opinion in holding that we could not consider, upon the issue of limitation, the original petition which was brought up as a part of the transcript and not shown to have been introduced in evidence. Under the rule announced in Rucker v. Dailey, 1 S. W. 316, 66 Tex. 285, appellants followed the proper practice in having the substituted pleading appear in the transcript. In considering appellants' demurrer raising the issue of limitation on the ground that the amended petition set up a new cause of action, the trial court could consider the original petition on file in the case, and it was not necessary for appellants to put that petition in evidence and have it brought up in the statement of facts to properly present it to this court. This is expressly decided in the case just cited. This error, as shown by our opinion, was not material in our holding upon the question of limitation presented by appellants. We adhere to the conclusion expressed in our former opinion that there is no merit in appellants' contention that appellee's cause of action was barred by the two years' statute of limitation. As we construe the pleadings, appellee has at all times asserted a cause of action against appellants for their refusal to deliver the rails upon the expiration of the lease. As before shown, the trial court found that the refusal of appellants to return the rails upon the demand of appellee occurred about September or October, 1917. This finding is not assailed by appellants and is binding upon this court. In addition to this the undisputed evidence shows that appellee was paid the rent for the rails up to June or July, 1917, and could not therefore require their delivery before that time. The original petition was filed March 21, 1919, within less than two

years after the cause of action upon which recovery was had accrued.

[17] The rule for determining when a new cause of action is set up in an amended petition to which the defense of limitation is available is nowhere more clearly stated than by the late Justice Finley in the case of Ry. Co. v. Richards, 32 S. W. 96, 11 Tex. Civ. App. 95. We make the following quotation from that opinion, which we think peculiarly applicable in this case:

"Damages for breach of contract and for tort are both therein alleged. Under our practice, if the facts alleged show a breach of contract, and acts amounting to a tort, all damages recoverable therefor under either of the forms of action, ex contractu or ex delicto, may be recovered in the one suit. Stuart v. Telegraph Co., 18 S. W. 351, 66 Tex. 581, 586 [59 Am. Rep. 623]. We cannot determine whether a new cause of action has been set up in an amendment by merely ascertaining the forms of action, as they exist at common law, disclosed in each of the pleadings. The common law is not in force with us upon this subject. Our practice is to state the facts, and if they authorize a recovery under any or all the forms of action, and whether in law or equity, the pleading will be treated as sufficient. The true test, in determining whether a new cause of action is pleaded, is, Are the facts relied upon to sustain a recovery alleged in both the old and new pleadings? If this inquiry can be answered in the affirmative, no new cause of action is set up. If, however, the amended pleadings disclose a different state of fact, upon which the suit is based, then it should be treated as a new cause of action. Lee v. Boutwell, 44 Tex. 152; Landa v. Obert, 14 S. W. 297, 78 Tex. 33; Scoby v. Sweatt, 28 Tex. 713. The court did not err in overruling the exception."

Appellants further contend that there is no evidence to support the finding of the court of the value of the rails at Caro, at the time appellants breached their contract to deliver them to appellee.

The trial court made the following findings as to the value of the rails:

"(17) I find as a fact that the highest market value of 1,131.74 tons of good secondhand steel after the date of its conversion was $55 per ton, and I find as a fact that the highest market value of 47.098 tons of scrap steel after its conversion was $29 per ton.

"(18) I find as a fact that the value of 1,131.74 tons of steel at the time of the trial was $30 per ton; and I find as a fact that the value of the scrap steel at the time of the trial was $11 per ton.

"(19) I find as a fact that the highest value of the steel that plaintiff is entitled to recover was as follows:

1,131.74 tons valued at...................... $39,510 90
47.098 tons valued at.........................'    470 98

Making a total value of the steel at the'
time it was delivered..................... $39,981 88"

[18, 19] We agree with appellants that the facts in this case do not show such fraud, willful wrong, or gross negligence as would justify holding them liable for the highest market price of the rails between the date of their refusal to deliver the rails and the trial in the court below, and they should only be held liable for the value of the rails at Caro at the time appellants refused to deliver them to appellee. We think the finding of the court before set out was intended and must be regarded as a finding of the value of the rails at the time they should have been delivered by appellants. There was no mention in the pleadings or evidence of the value of the rails at the time they were delivered to appellants, and that inquiry was foreign to any issue in the case. The use of the term "was delivered" in the finding should be regarded as an inadvertent clerical error.

The evidence offered by appellee is not as definite as it should be as to the place and the exact time at which the witnesses fixed the value of the rails, but no objection was made to the evidence by appellants. Mr. Waid, general manager of appellee railway, testified:

"At the time the question of our claim for the return of this steel came up, we estimated it to be worth $55 for the greater portion of it, which was in condition for use, and $12 for a small portion, which was crooked. There was a small portion of it that upon inspection was found to be of little value, or, in other words, scrap rail, and that was estimated at $12 per ton, gross ton, that is 2,250 pounds, that is a long ton. The other rail was worth $55 per ton. I took occasion to look up our records to see what they showed as to the amount of scrap; the lot of 15 miles, and the scrap rail was found to amount to 4 per cent., or 6,330 lineal feet, 47.098 gross tons having the commercial value of $12 per ton, amounting to $565.18. The remainder, 152,072 lineal feet, is fairly good secondhand relay rail, 1,131.74 tons at $55 a ton, amounting to $62,231.02."

L. B. Wood, for appellee, testified:

"I live here in Houston. I am employed as general storekeeper for the Sunset Central Lines. I am acquainted with the market price of secondhand rail. There was a great demand for secondhand steel in the latter part of 1917 and 1918, 50-pound steel. I have heard something about this steel in controversy on the Caro Northern Railroad; it is 50-pound relay steel. The market value of that steel in 1917 and 1918 was from $50 to $60. We have sold rail as high as $55 and we could have sold some at $60 if we had had it at the time, the demand was so great. 50-pound relay steel at the present time is worth about $30."

A letter written by Mr. Scott, president of appellee railway, on June 11, 1917, in reference to a proposed lease of the rails by the Caro Northern Railway, which states that "the present value of the rails is $35 per ton," was also introduced in evidence, on the question of value, without objection.

This is all of the evidence on this issue.

[20] The value found by the trial court is less than that fixed by any of the testimony,

and we think it is a reasonable inference from the testimony as a whole that the rails were worth at Caro, at the time appellants refused to deliver them to appellee, not less than the amount found by the trial court.

We do not think the motion presents any valid objection to our judgment affirming the judgment of the trial court, and it is therefore refused.